## SUPERIOR COURT.

JAMES J. WOOLSEY agt. OWEN B. JUDD, WILLIAM B. McKAY, THOMAS HOLMAN, GEORGE W. GRAY and HENRY WILBUR.

It is doubtful whether the courts of the United States, under the act of congress amending the several acts respecting copyrights, passed February 3, 1831, have power to restrain, by injunction, the publication of private letters contrary to the wishes of the writer.

The jurisdiction, however, which, under the act of congress, the federal courts may have acquired, has not impaired or affected the original jurisdiction of the state courts.

A court of equity cannot interfere to prevent the publication of private letters, merely on the ground that such a publication, without the consent of the writer, as a breach of confidence and social duty, is injurious to the interests of society.

The interference of the court can only be justified upon the ground that the writer has an exclusive property which remains in him, even where the letters have been transmitted to the person to whom they were addressed.

*Held,* upon a full examination of the adjudged cases, that the law must be considered as established,

1st. That the writer of letters, whether they are literary compositions, or familiar letters, or letters of business, possesses the sole and exclusive right of publishing the same; and that, without his consent, they cannot be published either by the person to whom they are addressed, or by any other.

2d. That the receiver of the letters may, however, justify their publication, when it is shown to be necessary to the vindication of his own rights or conduct, against unjust claims or imputations.

And lastly, That if the receiver attempt to publish the letters, or any parts of them, against the wishes of the writer, and upon occasions not justifiable, a court of equity is bound to prevent the publication by an injunction, as a breach of that exclusive property which the writer retains.

*Held* further, that, as against a stranger who has possessed himself of the letters or of copies thereof unlawfully, the right to restrain the publication by an injunction is absolute—such person not being justified in publishing the letters for any purpose whatever.

*Held,* that the cases of *Wetmore* agt. *Scovell,* (3 *Edw. Ch. R.,* 515;) and of *Hoyt* agt. *M'Kenzie,* (3 *Barb. Ch. R.,* 314,) in which it was decided that an injunction to restrain the publication of private letters, can only be granted when it appears that the letters possess a certain value as literary compositions, were a departure from the law as previously established, and ought not, therefore, to be considered as binding authorities.

*Before* OAKLEY, Chief J.; DUER, CAMPBELL, BOSWORTH, HOFFMAN and SLOSSON, JJ. *Decided March* 7, 1855.

THIS was an appeal from an order at special term, dissolving an injunction, but continuing the same, if the plaintiff should appeal within ten days, until the hearing of the appeal.

The complaint stated in substance, that the defendants, by some unlawful means, had possessed themselves of a copy or copies of a certain letter, wholly private in its character, which the plaintiff had written and forwarded to one William Crowell, residing at St. Louis, in Missouri; and that they had avowed their intention to publish the same in a weekly journal, called the New-York Chronicle, of which they were the editors, proprietors or publishers; and it prayed that they might be enjoined against printing, publishing, circulating, or in any manner, either by writing or otherwise, making public the said letter or any part thereof.

Mr. Justice CAMPBELL granted an injunction according to the prayer of the complaint; and the defendants moved, at special term, for its dissolution upon their answers, and upon affidavits.

The defendant, Judd, in his answer, denied that the letter in question was wholly private in its character; or, that by any unlawful means he had become possessed of a copy thereof. He averred that a copy of the letter was sent to him through the post office, accompanied by a note from a gentleman of the highest respectability, stating that he, the defendant, could make such use of it as he should think proper. He then alleged that the letter was not a literary production, nor of any value to the plaintiff as such; and, therefore, insisted that the court had no authority to restrain its publication, and demanded that the complaint should be dismissed with costs.

The answer of the defendant, McKay, was, in substance, the same.

The other defendants, Holman, Gray and Wilbur, denied, in their answer, that they or either of them, at the time of the commencement of the suit, or at any time since, had in their

custody or possession the said letter, or any copy thereof. They admit that they were the publishers of the weekly Chronicle, but averred that they had no control over it, nor any power to direct or prevent the publication of the plaintiff's letter.

It is needless to state the contents of the affidavits. It is sufficient to say, that the defendant, Judd, avowing himself to be the editor of the weekly Chronicle, claimed the right to publish the letter in question, for the purpose of fixing upon the plaintiff, and his correspondent, Crowell, the imputation of being the authors or instigators of certain anonymous and abusive publications, relative to a religious society, called " The American Bible Union," its proceedings, agents, and friends.

At special term, Mr. Justice Hoffman, holding himself bound by the decision of Chancellor Walworth in *Hoyt* agt. *M'Kenzie*, made the order appealed from.

The motion, upon the appeal for the reversal of this decision, was twice argued by

E. D. Culver, *for the plaintiff, and*
W. W. Niles, *for the defendants.*

Upon the first argument, the counsel did not advert to an important section in the act of congress, entitled " An act to amend the several acts respecting copyrights," passed February 3, 1831. That section is in the following words :

Sec. 9, " That any person who shall print or publish any manuscript *whatever*, without the consent of the author first, obtained in writing, he shall be liable to an action for damages. And the several courts of the United States, empowered to grant injunctions to prevent the violation of the rights of authors, are hereby empowered to grant injunctions, in like manner, according to the principles of equity, to restrain the publication of any manuscript as aforesaid."

The second argument which was directed by the court, was confined to the questions, whether the provisions in the above section were applicable to private letters not intended to be

published ; and, if so, whether the jurisdiction of the courts of the United States, to restrain their publication, was exclusive.

By the court—Duer, Justice.—We think it a doubtful question, whether the act of congress of 1831, broad as its terms certainly are, was intended to apply, and ought, therefore, to be construed as applying, to cases like the present ; but it is to the courts of the United States, that the decision of the question properly belongs. It is not necessary that we should decide it, since we are clearly of opinion that the jurisdiction which, under the act of congress, the courts of the United States may have acquired, has not taken away or at all diminished that which, before the passage of the act, the state courts might rightfully have exercised. The general rule is undoubtedly, that which is laid down and fully vindicated by General Hamilton, in the 82d No. of the Federalist—namely, that the state courts retain their jurisdiction in all the cases of which originally they had cognizance ; and, in the application of this rule, the decisions in our own courts appear to have settled that there are only two classes of cases in which the jurisdiction of the courts of the United States may justly be regarded as exclusive. The first, where the jurisdiction is made exclusive by the express terms, or by the necessary construction of the provisions of the federal constitution. The second, when an act of congress confers a jurisdiction, that before its passage could not have been exercised at all—that is, when the act not merely confers, but creates the jurisdiction. (United States agt. Lathrop, 17 John., 5 ; Delafield agt. State of Illinois, 2 Hill, 159,—opinion of Bronson, J. ; Dudley agt. Mahew, 3 Comst., 15.) It is obvious that to neither of these classes can we refer the case that we are now required to decide, if the views of the plaintiff's counsel, as to the original jurisdiction of the state courts, shall be sustained. If the jurisdiction we are called upon to exercise, was vested in the state courts before the act of congress was passed, it subsists unimpaired ; and hence, it is upon the question of its prior existence that, in

our judgment, the whole controversy turns. If, in the exercise of a power that courts of equity in similar cases have been accustomed to exercise, we may grant the injunction that is prayed for, we do not at all doubt that it will be our duty to grant it.

We must, therefore, of necessity consider and determine the question, whether, upon the face of this complaint, and according to the established doctrine of equity, the plaintiff is entitled to the injunction prayed for.

The complaint does not aver that the letter of the plaintiff, to which it refers, has any value as a literary production, or that he will sustain any pecuniary damage, or any injury in his reputation or feelings from its threatened publication. It raises, therefore, the naked question, whether a court of equity is bound, or has power, to restrain, by injunction, the publication of private letters, in all cases in which it is alleged that the publication is about to be made without the consent, and contrary to the wishes, of the writer? The question is one of more than ordinary interest, and we have felt that it deserved to be examined with more than ordinary care.

We believe that few, who reflect upon the mischievous consequences which would certainly result from the unrestrained and frequent publication of private and confidential letters, will dissent from the opinion that it is highly desirable, looking to the best interests of society, that courts of equity should possess and firmly exercise the jurisdiction which is questioned. Our own views and feelings, we do not hesitate to declare, *correspond* entirely with those which Mr. Justice STORY, in the most elaborate and useful of his works, has very forcibly expressed. We agree with him, that the unauthorized publication of such letters, " unless in cases where it is necessary to the vindication of the rights or conduct of the party against unjust claims or imputations, is, perhaps, one of the most odious breaches of private confidence, of social duty, and of honorable feelings which can well be imagined. It strikes at the root of that free interchange of advice, opinions and sentiments, which seems essential to the well-being of society, and may involve

whole families in great distress from the public display of facts and circumstances which were reposed in the bosom of others, in the fullest and most affecting confidence that they should remain forever inviolable secrets." (2 *Story's Equity Jur.*, § 946.)

But, although, with Mr. Justice STORY, we cannot do otherwise than condemn a practice which springs from the motives, and leads to the consequences which he has depicted, and which, from the feelings of resentment it is calculated to provoke, is dangerous to the peace as well as the morals of the community, we must not be understood to assert that these considerations are alone sufficient to justify the interposition of a court of equity.

It is not necessary to deny, that upon these grounds alone the jurisdiction of the court cannot safely be placed. A court of equity is not the general guardian of the morals of society. It has not an unlimited authority to enforce the performance or prevent the violation of every moral duty. It would be extravagant to say that it may restrain, by an injunction, the perpetration of every act which it may judge to be corrupt in its motives, or demoralizing, or dangerous in its tendency. We advance no such doctrine, and we fully admit that an injunction can never be granted, unless it appears that the *personal* legal rights of the party who seeks the aid of the court, are in danger of violation ; and as a general rule, that the injury to result to him from such violation, if not prevented, will be irreparable. It must be shown that a right is endangered which the law defines and is bound to protect, and that the mandate of the court is its only adequate protection; but when, by proof of these facts, the jurisdiction is established, we cannot doubt that considerations of public good and public policy, may furnish motives, and powerful motives, for its prompt and effectual exercise. They may invest the legal right with an importance and dignity that would not otherwise belong to it, and convert the protection of a single individual into an extensive public benefit.

It being conceded that reasons of expediency and public

policy can never be made the sole basis of civil jurisdiction, the question, whether upon any ground the plaintiff can be entitled to the relief which he claims, remains to be answered; and it appears to us that there is only one ground upon which his title to claim, and our jurisdiction to grant, the relief can be placed. We must be satisfied, that the publication of private letters, without the consent of the writer, is an invasion of an exclusive right of property which remains in the writer, even when the letters have been sent to, and are still in the possession of his correspondent. If this legal right can be shown to exist—it seems evident that it is only by an injunction that it can be protected from invasion. The rule laid down by Lord ELDON in *Southey* agt. *Sherwood*, we apprehend is universal, that an injunction will be granted whenever it is necessary to prevent the unauthorized use of that which is the exclusive property of another. (2 *Merivale*, 437.)

We commence the inquiry into the existence of the legal right which we have stated is necessary to be proved, with observing, that there' is probably no doctrine which, in general, is more fully sustained, and, indeed, established by authority, than that the author of an unpublished manuscript has an exclusive right of property therein at common law—a right which entitles him to determine for himself, whether the manuscript shall be published at all; and in all cases to forbid its publication by another; and it is equally certain, that whenever this exclusive right is in danger of being violated, a court of equity is bound, upon the application of the author, to prevent the wrong by a perpetual injunction; so far, there is no controversy. The language of text writers is uniform and positive; the decisions numerous and express. (*Forrester* agt. *Waller*, cited 2 *Brown P. C.*, *Tomplin's* ed., p. 138, and by Lord MANSFIELD, 4 *Burr*, 2320; *Webb* agt. *Rose*, *id*; *Donaldson* agt. *Beckett*, 4 *Burr*, 2408; *Duke of Queensbury* agt. *Shebbeare*, 2 *Eden Ch. R.*, 329; *Southy* agt. *Sherwood*, 2 *Merivale*, 434; *Wheaton* agt. *Peters*, 8 *Peters' S. C. R.*, 591; *Eden on Injunctions*, 295, 296; 2 *Story Eq. Jur.*, § 943; *Curtis on Copyright*, pp. 84, 150, 159.) Nor has this common law right

been taken away or abridged by the statutes that have been passed for the protection of copyright, in the ordinary sense of the term. Its existence is prior to these statutes, and independent of their provisions. In the great case of literary property, (*Donaldson* agt. *Beckett*, 2 *B. P. C.*, 130 ; 4 *Burr*, *ut sup.*,) in which it was finally determined by the house of lords, that the perpetual right of authors in their *published* works, if it existed at all at common law, was taken away by the statute of Anne, and reduced to the period which the statute allows ; it was affirmed by all the judges, with a single exception, not only that an author has, at common law, the sole right and dominion over his own manuscript ; but that this established right was not changed or affected by the provisions of the statute. The right is still absolute and exclusive ; and so long as the manuscript may exist unpublished, and its author or his representatives may choose, perpetual.

What then is the foundation at common law of this exclusive right ? Does it exist only when the manuscript is intended to be published ? or does it depend upon its pecuniary value or intrinsic merits as a literary composition ? To each question, we think, the reply may be confidently given, certainly not. In none of the cases is there any reference to these circumstances, or any of them, as necessary to be averred or proved, in order to establish the rights of the author or the jurisdiction of the court ; and in some, the admitted facts repel the supposition that such proof could be required.

In *Webb* agt. *Rose*, where the injunction was granted to restrain the publication of certain drafts of settlements and other conveyances, which had been stolen by a clerk from the office of a conveyancer, and sold to a bookseller—the drafts were used in the office as forms and precedents, and there is no reason to suppose that they were meant to be published, either by the conveyancer who prepared them, or his representative who brought the suit. Their sole value, probably, consisted in their exclusive possession and use.

In *Forrester* agt. *Waller*, it does not appear that the notes of decisions to which the injunction related, were written with

any view to their future publication. It would seem that they were taken by Mr. Forrester for his own private use; and it is doubtless for this reason that Lord EDON says, that the decision in this case certainly applies to private letters. (2 *Swanston, p.* 426.)

We, therefore, agree entirely with the able author of the American treatise on the law of copyright; that the exclusive right of an author in a manuscript yet unpublished, rests upon the same foundation as that which sustains every other species or description of property. Its sole foundation is "the right which every man has to the exclusive possession and control of the products of his own labor." (*Curtis on Copyright, p.* 84.) We can perceive no reason for doubting that the exclusive property of an author rests exactly upon the same ground as that of a manufacturer or artist—a painting may be a wretched daub—a statute, a lamentable abortion; yet, should either be purloined by an enemy with the view to secure profits to himself, or to disgrace the artist by its public exhibition, a court of equity would renounce its principles should it refuse to protect the owner, the unfortunate artist, by a peremptory injunction. Such being the true foundation of the exclusive right of an author before publication; the next inquiry is, into the nature and extent of his right. And it is assuredly a great mistake to suppose that it is confined to the material on which his manuscript is written; and that it is only because he is owner of the paper that a court of equity interferes for his protection. This is so far from being true, that had he no other right of property than in the paper, we hold it to be certain that a court of equity would not interfere at all; and we affirm with confidence, that no case is to be found in which the court has interfered upon this ground. Merely as owner of the paper, an action at law, in which the measure of damages would be the value of the material, would afford him a full and adequate remedy, and to this remedy he would undoubtedly be left. The exclusive right, which alone a court of equity is bound to protect, and which, from its nature, can only be protected by an injunction, is his right of property in the words, thoughts

and sentiments which, in their connection, form the written composition which his manuscript embodies and preserves. This composition—whether, as such, it has any value or not, is immaterial—is his work, the product of his own labor, of his hand and his mind ; and it is this fact which gives him the right to say that without his consent it shall not be published, and makes it the duty of a court of equity to protect him in the assertion of that right by a permanent injunction.   Of this, it is a conclusive proof, that the right to control the publication of a manuscript remains in the author and his representatives, even when the material property has, with his own consent, been vested in another.   The gift of the manuscript it is settled, unless by an express agreement, carries with it no license to publish.  (*Duke of Queensbury* agt. *Shebbean*, 2 *Eden*, 339 ; *Thompson* agt. *Stanhope*, *Ambler*, 737.)   Not only is the right of property in the author not subject to the limitation which some have supposed to exist, but it is absolute as well as unlimited.   When he applies for an injunction, it is not necessary that he should aver that he desires to take from the defendants, or to secure to himself, the profits of publication.   As owner, he has an absolute right to suppress as well as to publish ; and he is as fully entitled to the protection and aid of the court, when suppression is his sole and averred object, as when he intends to publish.   In the remarkable case of *Southy* agt. *Sherwood*, which, at the time, was the subject of great discussion in England, the avowed object of Mr. Southy was to suppress entirely and forever the publication of a very rash and intemperate production of his youth, and the injunction prayed for would certainly have been granted, had not Lord ELDON been of opinion that the character of the work, as a seditious libel, by destroying the author's right of property, deprived him of the claim he would otherwise have had to the protection of the court.  (*Southy* agt. *Sherwood*, 2 *Merivale*, 435 ; *Earl of Granard* agt. *Dunhen*, 1 *Ball & Beat.*, 207 ; *Curtis on Copyright*, 157, 158, 159.)

The genaral doctrine, as to the right of an author in an unpublished manuscript, being such as we have now endeavored

Woolsey agt. Judd and others.

to explain, it is evident that it casts the burthen of the argument upon those who contend that private letters must be excepted from its application. If the doctrine is just as applicable to them as to all other manuscripts, it is clear that the plaintiff is entitled to the relief which he claims. It must be shown, therefore, that there are valid reasons for admitting an exception of private letters, or that the exception, whether reasonable or not, is established by decisions that we are not at liberty to disregard. Whether we are bound to adopt the reasons or follow the authorities that are relied on, are the questions next to be considered.

There are only two grounds upon which it has been insisted that private letters are an exception from the general doctrine. The first is, that the transmission of the letters vests the whole property in the receiver, and operates as an absolute gift. The second—that if the writer retains any property at all, it is only in such letters as are stamped with the character and possess the attributes of literary compositions.

The first ground of exception, as plainly overruled by the decisions, was very properly abandoned by the counsel of the defendants. He rested his whole argument upon the second; and, holding himself excused from any close examination of the English cases, relied upon the decision of Chancellor WALWORTH, in *Hoyt* agt. *M'Kenzie*, as a binding and conclusive authority. (3 *Barb. Ch. Cases*, 324.)

Now, it cannot be denied that the decision in *Hoyt* agt. *M'Kenzie* is an express authority in favor of the defendants; and if, as is asserted, we are under a positive obligation to follow that decision, it must be owned that we have no power to grant to the plaintiff the relief which he claims. The Chancellor, in that case, dissolved an injunction, which the plaintiff had obtained to restrain a very mischievous and dishonest publication of confidential letters, upon the sole ground " that it was evident the plaintiff could not have considered the letters as of any value whatever as literary productions, for a letter cannot be considered of value to the author for the purpose of publication, which he never would consent to have published."

They are the exact words of the Chancellor which we have quoted, and it is plain that they amount to a positive denial that an author of private letters, which he wishes to suppress, and not to publish, has any right of property at all—that he has any right to say that they shall not be published by another, unless he means to publish them himself. The Chancellor did not deny that, as a general rule, the author of an unpublished manuscript has at common law an exclusive right of property, the violation of which may justly be prevented by an injunction ; for he distinctly admits that this is the *settled* law. But he certainly meant to deny that the plaintiff, in the case before him, had any property in the letters which he desired to suppress, and consequently, the position upon which he rested his judgment may be briefly stated as follows :—Private letters not intended to be published, have no value whatever ; and when they have no value for the purpose of publication, they are not property. In a subsequent part of his opinion, the Chancellor expresses, in terms, his approbation of the final decision of Vice-chancellor M'Coun, in *Wetmore* agt. *Scovill,* (3 *Edwards Ch. R.,* 515,) that letters not professing the attributes of literary compositions are not, as property, entitled to protection.

In proceeding to examine, as we now propose, whether it is possible to reconcile this opinion of the late Chancellor, with the law as settled by prior decisions, and among these the very cases to which he has himself referred, we must not be understood as meaning to detract in any degree from the weight and authority to which his decisions, as those of a very able, learned and laborious judge, are generally and justly entitled. The judges of this court have frequently manifested the high sense which they entertain of his judicial merits, and it is with reluctance that we dissent, on any occasion, from any deliberate judgment which he has pronounced. But we deny that a recent and solitary *decision* of any judge, however eminent, ought to be regarded by us as conclusive evidence of the existing law ; and we deny that we are bound by the decisions of the Chancellor, in the same sense in which we are bound by *those* of the court of *ultimate* resort. We stand now in the same re-

lation to the court of appeals, as that in which he stood to the court of errors; and in the cases in which we exercise an equitable jurisdiction, have succeeded to all the powers which he possessed in similar cases. We have, therefore, exactly the same right to review, and, when convinced that errors have intervened that ought not to be perpetuated, to overrule his decisions, that he himself, and his successors in office, had not the court of chancery been abolished, might and would have exercised. It is known to us all that the cases are numerous in courts of equity, as well as of law, in which judges have felt it their duty to reconsider and reverse their own decisions and those of their predecessors; and deplorable, indeed, would be the actual state of the law, (as none who have examined the valuable treatise of Mr. Greenleaf, on overruled cases, will doubt,) had not these powers of revision and correction been frequently and firmly exercised. We must all remember that the judgment in *Hoyt* agt. *M'Kenzie*, from the sanction which it apparently gave to a very dishonorable proceeding, excited general surprise and regret, so that even those who admitted its legality, were anxious to relieve the law from the reproach which it occasioned. We are convinced that this reproach, that of giving a sanction to immorality, is one to which the law was never justly liable, and from the continuance of which it ought, therefore, to be freed.

The proposition which we hold to have been settled as law, for more than a century before the judgment in *Hoyt* agt. *M'Kenzie* was pronounced, is that which was laid down by Sir SAMUEL ROMILLY, and affirmed by the decision of Lord ELDON, in *Gee* agt. *Pritchard*, (2 *Swanston*, 418.) It is that " the writer of letters, though written without any purpose of publication or profit, or any idea of literary property, possesses such a right of property in them, that they can never be published without his consent, unless the purposes of justice, *civil* or *criminal*, require the publication." If this proposition be true, it follows that the distinction which has been supposed to exist between letters possessing a value as literary compositions, and ordinary letters of friendship or business, is wholly ground-

less.   The right of property is the same in all, and in all is entitled to the same protection.

The earliest case, and that which may be truly said to have established the *law*, since its controlling authority is admitted in all that follow, is *Pope* agt. *Curl*, (2 *Ath.*, 342.)   An unknown person, by means never explained, had possessed himself of a large number of private and familiar letters, which had passed between Mr. Pope and his friends Swift, Gay and others, and had printed them secretly in Ireland, in a book entitled " Letters from Swift, Pope and others."   The defendant, a piratical bookseller in London, had purchased and advertised for sale the printed copies of this book—and the plaintiff had obtained an injunction restraining the sale.

It was upon a motion to dissolve this injunction, that the case came before Lord HARDWICKE.   It is briefly reported, but there is no difficulty in collecting either the grounds upon which the motion was rested, or those upon which it was denied.

It was contended by the defendant's counsel, that as the printed book contained only letters never intended to be published, and written on familiar subjects—such as inquiries after the health of friends, and other similar topics—it was not a learned work, and therefore was not within the meaning and intention of the statute of Anne, (8 *Anne, c.* 19,) vesting the copy-right of printed books in the authors.   The argument was, that as the writer of such letters could not, by printing them, secure a copy-right to himself, he could have no right to prevent them from being printed by others.   Lord HARDWICKE put an end to this argument, by observing that it would be extremely mischievous to make a distinction between a book of letters, published by the permission of the writer or receiver, and any other work; and to show that the objection that the letters were not written to be published was groundless, he remarked, that it would apply equally to sermons which the authors never intended should be published, but which are collected from his notes, and published after his death.   In a subsequent part of his opinion, and in reply to the same objec-

tions, he observed, and proved the justness of his taste in the observation, that letters never intended to be published, and written on familiar subjects, are usually more *interesting and valuable* than those elaborately written and originally intended for the press.

We have here, then, a positive decision that private letters, although not intended to be published, and however familiar and trivial the subjects to which they relate, are a legitimate subject of a statutory copy-right, which a court of equity is bound to protect; and it is an obvious and necessary conse-quence of this decision that the writer of such letters has an ab-solute right to forbid their publication by another, since by such a publication, if not restrained by an injunction, his own right to publish them for his own benefit, under an exclusive copy-right—a right inherent in him and his representatives, until it is chosen to be asserted—would be defeated. Had not this consequence, obvious and necessary as it is, been overlooked, the obligation of a court of equity to protect, by an injunction, the writer of such letters, without any other inquiry than into the fact of his authorship, could never have been drawn in question by any who admit the authority of the decision itself.

The second objection which was urged by the defendant's counsel in *Pope* agt. *Curl*, was far more plausible. It was, that the sending of letters is in the nature of a gift to the re-ceiver, and, consequently, that the writer retains no property at all.

The answer of Lord HARDWICKE to this objection I shall give in his exact words as reported, in order that it may be seen how entirely they exclude any reasonable doubt as to its import and effect. His words are—"*I am of opinion that it is only a special property in the receiver. Possibly the property in the paper may belong to him, but this does not give a license to any person whatsoever to publish them (the letters) to the world; for at most, the receiver has only a joint property with the wri-ter.*" Such were the grounds upon which this eminent judge continued the injunction as to the letters written by Mr. Pope, but dissolved it as to those which he had received, plainly be-

cause, as receiver, he had no right of property which entitled him to control their publication. The decision was made in 1741. There was no appeal. It has been, from that time to the present, unquestionable and unquestioned law. Doubts have been raised, it will hereafter be seen, as to its meaning and application; none whatever as to its controlling authority. Chancellor WALWORTH himself refers to it as evidence of that common law which our first state constitution declared could only be altered by legislative authority, and which he held himself bound to follow. If, therefore, he departed from the positions it established, we have his own acknowledgment that he erred.

What, then, are the propositions which Lord HARDWICKE, by his decision in *Pope* agt. *Curl*, established as law? It seems to us, that by the plain and necessary interpretation of his language, they are these :—*First*, That the receiver of letters has only a special or qualified property, confined to the material on which they are written, and not extended to the letters as expressive of the mind of the writer. *Second*, That neither the receiver thereof nor any other person has any right to publish the letters without the consent of the writer. And, *lastly*, That the property which the writer retains gives him an exclusive right to determine whether the letters shall be published or not; and, when he forbids their publication, makes it the duty of a court of equity to aid and protect him by an injunction. It appears to us equally certain that these rules are laid down, and were meant to be laid down, as universal in their application, as embracing all letters, whether intended to be published or not, and whatever may be the subjects to which they relate. Not only was there no intimation that there is any distinction between different kinds or classes of letters, limiting the protection of the court to a particular class; but the distinctions that were attempted to be made, and which seem to be all that the subject admits even, expressly rejected as groundless.

The next case—*Thompson* agt. *Stanhope*, (*Ambler*, 737,) which is perhaps even stronger than *Pope* agt. *Curl*—came before Lord BATHURST, (then Lord APSLY,) in 1774. The

Woolsey agt. Judd and others.

executors of Lord Chesterfield filed the bill to enjoin the pub-
lication, by the widow of his son, of those celebrated letters
which, for a series of years, he had written to her husband;
and also the publication of certain characters, probably not
very flattering, which he had drawn in writing of some of his
contemporaries.    The motion to dissolve the injunction was
made on the ground that Lord Chesterfield had himself given
to the widow both the letters and the characters—and the fact
seems to have been admitted.    But it was contended, on the
part of the plaintiffs, that there being no proof of an express
authority to publish, none could be implied from the gift, and
that consequently the exclusive right to control the publication
remained in Lord Chesterfield, and had passed to his repre-
sentatives.    The Lord CHANCELLOR was of this opinion, and,
declaring himself bound by the authority of *Forrester* agt. *Wal-
ler*, and *Pope* agt. *Curl*, continued the injunction.    It does not
appear, from the report, to have been alleged that the letters
or characters were written by Lord Chesterfield with any view
to their future publication, or that the publication of either was
intended by the plaintiffs.

We come next, after a lapse of nearly forty years, and of
more than seventy from the decision of Lord HARDWICKE, to
the case of *Lord and Lady Percival* agt. *Phipps and another*,
(2 *Ves. & Beames*, 19,) and we find here, not in the decision
itself, but in the somewhat desultory, and wholly extra-judicial
remarks of the vice-chancellor, Sir THOS. PLUMER, the true and
only source of all the doubts and difficulties that have been
permitted to embarrass the question, and have, unfortunately,
led to a conflict of decisions.    The bill prayed for an injunc-
tion to restrain the publication, by the defendants, of certain
private letters, which, it was alleged, had been sent by Lady
Percival to the defendant Phipps, and in its frame bore an
exact resemblance to the complaint before us.    It was de-
scribed by the VICE-CHANCELLOR "as the naked case of a bill
to prevent the publication of private letters, not stating the
nature, subject, or occasion of them, or that they were intended
to be sold as a literary work for profit, or were of any value to

the plaintiffs." Upon this bill, the injunction prayed for was granted by Lord ELDON; and that it was granted upon full deliberation, is evident from the fact that, not considering the statements in the bill sufficiently explicit, he required from Lady Percival, in order to bring the case within *Pope* agt. *Curl*, a positive affidavit that she was the author of the letters. (2 *Ves. & Beames*, 26.) The answer of the defendants, upon which their counsel moved to dissolve the injunction, set forth certain facts, tending to show that the publication of the letters was necessary to repel a charge of falsehood and forgery, which the plaintiffs had publicly made against them. And it was upon the sole ground that the conduct of the plaintiffs had given to the defendants a perfect right to use the letters for their own vindication, that the VICE-CHANCELLOR dissolved the injunction; and the propriety of this decision is not questioned.

But although this was the sole ground of his decision, and the consideration, therefore, of any other *question quite unnecessary*, the VICE-CHANCELLOR, both upon the hearing and on delivering his final judgment, chose to discuss the general question, how far, and in what cases, a court of equity will interpose to protect the interest of the author of private letters. And in the course of his observations he lays down, in positive terms, the novel doctrine, that it is only when the letters—[in his own words]—" are stamped with the character of literary compositions," that the writer can be protected by an injunction against their publication. And he, in effect, asserts that the character and value of the letters of Pope and Lord Chesterfield, as literary compositions, was the true and only ground of the decisions in *Pope* agt. *Curl*, and *Thompson* agt. *Stanhope*, and consequently that these cases were inapplicable to that which was before him—it not being pretended that such was the character of Lady Percival's letters. The VICE-CHANCELLOR did not say, in terms, that Lord ELDON erred in granting the injunction; but if his remarks were just, and the distinction he stated well founded, such is the necessary consequence. If his doctrine was law, and his interpretation of

former decisions correct, it is clear that the injunction ought not to have been granted.

The vindication of Lord ELDON from the criticisms and implied censure of Sir THOS. PLUMER, will seem, to all who have any knowledge of their relative standing and authority as jurists and judges, a very gratuitous task—and it is a task from which we should certainly have abstained, had it not unfortunately happened that the rash speculations of the latter have been followed, in preference to the deliberate judgments of the former.*

It is undoubtedly true that the letters of Pope, and of Lord Chesterfield, possessed a far more than ordinary value as literary compositions; but there is not the slightest evidence that it was upon this distinctive character and value that Lord HARDWICKE, in *Pope* agt. *Curl*, or Lord BATHURST, in *Thompson* agt. *Stanhope*, founded his decision.

On the contrary, in each case, the doctrine is laid down in general terms, with no intimation that there is or can be an exception, that the writer of letters has an exclusive right not only to publish them himself, but to forbid their publication by others; and that a court of equity is bound to enforce his prohibition by its own injunction. That these cases were thus understood by Lord ELDON is certain, since otherwise the injunction which the VICE CHANCELLOR dissolved would never have been granted.

It cannot, therefore, be said that the views of Sir THOMAS PLUMER derive any countenance from prior decisions. It remains to be seen whether they have any solid foundation in reason. All that he says proceeds upon a distinction which, it seems to us, either does not exist at all, or, if exists, has no practical value. In other words, furnishes no rule which a

* Extract from the private diary of Sir SAMUEL ROMILLY, under date of April 9th, 1813,—about two months before the decision in *Percival* agt. *Phipps*:—

"A worse appointment than that of PLUMER to be Vice-Chancellor could hardly have been made. He knows nothing of the law of real property, nothing of the law of bankruptcy, and nothing of the doctrines peculiar to courts of equity,"—*Memoirs of the Life of Sir Samuel Romilly, Vol.* 2, *p.* 310.

court of justice can rationally or consistently apply. The assertion is, that some private letters are literary compositions, and some are not. Those which are, may be protected as property; those which are not, may be stolen and published with impunity—the writer has no property, and sustains no injury.

But we agree with Mr. Justice STORY, (2 *Story R.,*) that every letter is, in the general and proper sense of the term, a literary composition. It is that and nothing else; and it is so, however defective it may be in sense, grammar, or orthography. Every writing, in which words are so arranged as to convey the thoughts of the writer to the mind of a reader, is a literary composition; and the definition applies just as certainly to a trivial letter as to an elaborate treatise, or a finished poem. Literary compositions differ widely in their merits and value, but not at all in the facts from which they derive their common name.

To create, therefore, the distinction that has been assumed to exist, it is evident that the words, "literary composition," must be understood in a peculiar and restricted sense, which renders them applicable to a particular class of letters, and not to any others; and it is just as evident that, to enable courts of justice to act upon the distinction, this restricted sense of the words must be ascertained and defined. This is only saying, that the distinction must be understood before it can be applied. Hence the necessary inquiry is, what are the peculiar circumstances, the distinctive qualities, or attributes, that must be found to exist, in order to stamp upon letters the character of literary compositions? Upon this inquiry, the observations of Sir THOMAS PLUMER throw no light whatever. The learned judge shrouded his meaning in loose and vague generalities— and from these we must endeavor to extract it. He probably meant to say, either that letters are not to be regarded as literary compositions, unless it appears that they were originally written with the intent to publish them, or that their author would derive from their publication a certain profit, or that from their intrinsic merits their publication would be a benefit

to the world.   Intended publication, pecuniary value, or intrinsic merit must furnish the requisite test—nor are we aware that any other has been suggested or can be stated.

Now it is manifest, that if either of these circumstances is to be admitted as the test of literary composition, it is a test which cannot be limited in its application to private letters.   It is just as applicable, not only to all other unpublished manuscripts, but to all printed books.   If a letter, destitute of certain qualities or attributes, is not a literary composition, neither is a book to which exactly the same qualities are wanting.   The inherent qualities of the manuscript are not altered by its publication— and certainly no addition is made to them by the process of printing.   Hence, if private letters, which, in the restricted sense which Sir THOMAS PLUMER adopts, are not literary compositions, as not within the spirit of the acts of parliament securing a copy-right to authors,—(for such is the argument,)— are not entitled to protection as literary property, it follows, that printed books which, in the same sense, are not " literary compositions," as equally not within the spirit of these acts, ought to be excluded from the benefit of their provisions.   The statement of this necessary consequence is of itself a sufficient refutation of the whole doctrine of the VICE-CHANCELLOR; for assuredly it has never been pretended that the copyright of the author of a published book is liable to be impeached and defeated by inquiry into his intentions in writing it, or into the *merits* or value of his work as published.

If, therefore, the question, whether a book is a literary composition can never be raised, as involving that of the right of property in the author, there is a plain inconsistency in permitting the application of the test to unpublished manuscripts, whether private letters or of any other class.   The writer of letters, if he choose to print them himself, may obtain a valid copy-right—and whether he will obtain it rests entirely in his own discretion: so long, however, as the letters are preserved, the right of obtaining the statutory copy-*right* exists in the writer and his representatives; and while it exists it is, in its nature, a right of property which a court of equity is as much

bound to protect as any other.   It is a right, however, which
the court effectually defeats by permitting, in any case, the
publication of letters without the consent of the writer.  There
can be no exclusive copy-right, if all may publish with im-
punity.

To pass from these general observations.

The proposition, that in familiar letters, not intended by the
writers to be published, there can be no property which a
court of equity will protect from invasion, is precisely that
which, in *Pope* agt. *Curl,* and in *Thompson* agt. *Stanhope,* is
expressly overruled.   There is no evidence that the letters of
Pope, and his friends, or those of Lord Chesterfield, were
originally written for the press.   And in relation to those of
Pope, the report shows that the fact was admitted to be other-
wise.   There is, moreover, a positive absurdity in making the
character of any manuscript, as a literary composition, depend
upon the extrinsic and accidental fact of the intention to pub-
lish:   Apply this test, and the plays of Shakespeare are not
literary compositions, since there is every reason to believe
that not a single play was written with any view to its future
publication.

There is the same confusion of ideas and language, in making
the character of a manuscript, and the right of property in the
author, depend upon the accident of its value for publication—
its pecuniary or marketable value.   Booksellers are eager to
purchase the copy-right in the autobiography of a shameless
adventurer or self-convicted impostor; but we doubt whether
one can be found within the limits of the Union who, even
without any hazard of competition, would dare to publish, at
his own risk and expense, the Principia of Newton, or the Sys-
teme of La Place, or even a full edition of the prose works of
Milton.

Rejecting, then, as we must, the tests " of intended publi-
cation," and " pecuniary value," it remains to consider whether
the character of letters as literary compositions, and therefore
literary property, may be determined by a reference to their

Woolsey agt. Judd and others.

contents and intrinsic merits—the merits of language and thought, style and sentiments.

It must be admitted that the differences, in these respects, between familiar letters, as between all other productions of the intellect, are wide and strongly marked, and fully justify their distribution by critics into many distinct classes; but we seriously deny that it is possible to extract from these differences any *rule of classification,* which a court of justice can be warranted to adopt as a *rule of decision.*

If the question, whether the letters of which the publication is sought to be restrained, from the nature of the subjects to which they relate, of the sentiments they convey, or the style in which they are clothed, deserve to be classed with literary compositions, is to be determined by the judge to whom the application for relief is made, it is evident that his determination must, and will be governed by his own personal, and it may be, peculiar opinions, taste, studies, and associations. The determinations in such cases will, therefore, be just as various and inconsistent as the literary taste and attainments, and the casual predilictions and prejudices of the judges by whom they are pronounced. The letters extolled by one as full of interest or instruction, will be condemned by another as utterly worthless. The injunction granted to-day will be dissolved, or, in cases not distinguishable, be denied to-morrow; and the questions of the right of property, and its title to protection, will be resolved, not by the application of rules of law to facts admitted or proved, but in the exercise of a discretion constantly varying and purely arbitrary. The decisions in most cases will appear to be, and in many will be, the mere result of accident or ignorance, prejudice or caprice. Whether the letters which he has written possess literary merits which render them worthy of publication, is a question which it belongs to the writer alone, and the public, to determine. It is exactly one of those which, from the necessary and total absence of any fixed rules or principles of decision, a court of justice can never rightfully entertain.

It follows, from these remarks, that the test of intrinsic·

merits must also be rejected. At first view, it seems less unreasonable than that "of intended publication," or "pecuniary value;" but, as it admits no certain definition, and is necessarily shifting, and precarious in its application, it is, in reality, more objectionable than either. Any definite rule is better than an unlimited discretion.

The error, which lies at the foundation of all the reasoning of Sir THOMAS PLUMER, is that which an able writer, to whose valuable treatise on the law of copy-right we have before referred, has very clearly stated. The VICE-CHANCELLOR confounds the rights of property in an unpublished manuscript, with those in a published book. The exclusive right of the author of the book is to take the entire profits of publication. That of the writer of the manuscript, to control the act of publication, and, in the exercise of his own discretion, to decide whether there shall be any publication at all. (*Curtis on Copyright, p.* 93.)

In making the right of property in letters depend on their value for publication, as the VICE-CHANCELLOR certainly does, he denies, by a necessary implication, that the writer has any title to relief at all, when his object is not to publish, but suppress. If the character or value of letters, as literary compositions, alone *creates* a right of property in the writer, these facts, when an action is brought to restrain an unlicensed publication, as those upon which the right to maintain the action depends, must necessarily be averred in the complaint. If averred in the complaint, they may be denied in the answer; and if so denied, they must be proved upon the trial. The plaintiff must then either abandon his suit, or make the necessary proof by making the letters themselves, or copies, exhibits in the cause—and thus publish them himself to all the world, to prevent their publication by the defendant.

According to this doctrine, should a faithless clerk, who has secretly taken copies of the confidential business letters of the merchant who employed him, from motives of revenge, and with the design of blasting the credit and ruining the fortunes of his employer, threaten to publish them, the merchant would

Woolsey agt. Judd and others.

have no redress in equity or at law. He cannot say that his letters have value as literary compositions, or that he meant to publish them for his own benefit; he has therefore no property that a court of equity can be required to guard from invasion; and as there is no violation of any of his rights of property, he can recover no damages in an action at law. An indignant public may condemn the vile treachery of the clerk, but it is a treachery that equity will not prevent, and the law refuses to punish. Such is the doctrine of Sir THOMAS PLUMER, and, I regret to say, the doctrine in *Hoyt* agt. *Mackenzie.* We cannot, however, believe that such is, or ever has been, the doctrine of the common law, and that it has found no favor in England; but, on the contrary, has been decisively rejected, as the case next to be cited will conclusively show.

In *Gee* agt. *Pritchard,* (2 *Swanston,* 402,) the last of the English cases, it is interesting to observe with what a gentle yet firm hand Lord ELDON sweeps away the unsubstantial theories and distinctions of this VICE-CHANCELLOR, and, scattering doubts that ought never to have been raised, resettles the law upon its old and true foundation. The case was before him on a motion to dissolve the injunction which he had previously granted, forbidding the publication, by the defendant, of a number of private and confidential letters, which had been written to him by the plaintiff in the course of a long and friendly correspondence. The plaintiff was a widow lady, and the defendant the natural son of her late husband; and they had lived for many years on terms of great intimacy and kindness. Disputes, however, had arisen between them relative to the property left by her husband; and in consequence of these, at the request of the plaintiff, he had returned to her the original letters; but he had kept copies, from which he now claimed the right to publish them, in vindication of his own proceedings and conduct. Two questions were raised and fully argued by the most eminent counsel then at the chancery bar. First, whether the plaintiff had such a property in the letters as entitled her to forbid their publication—it being fully admitted that they had no value whatever as literary compositions, and that she never meant to publish

them; and, second, whether her conduct towards the defendant
had been such as had given him a right to publish the letters
in his own justification or defence. These questions were
properly argued as entirely distinct, and each, was explicitly
determined by the Lord CHANCELLOR in favor of the plaintiff.
The motion to dissolve the injunction was accordingly denied,
with costs. It has been said, that it was through considerable
doubts that Lord ELDON struggled to this decision: but the
doubts which he expressed related solely to the question,
whether it ought originally to have been held that the writer
of letters has any property in them after their transmission.
He had no doubts whatever that such was the established law,
and that he was bound to follow the decisions of his predeces-
sors. He expressly says, that he would not attempt to unsettle
doctrines which had prevailed in his court for more than forty
years, and could not therefore depart from the opinion which
Lord HARDWICKE and Lord APSLY had pronounced in cases
(*Pope* agt. *Curl, Thompson* agt. *Stanhope*) *which he was unable
to distinguish from that which was before him.* (2 *Swanston,* 450.)
Subsequently, in support of his opinion that the plaintiff had
a sufficient property in the original letters to authorize an in-
junction, he refers to the language of Lord HARDWICKE, (quot-
ing the exact words, in *Pope* agt. *Curl,*) as proving the doc-
trine, that the receiver of letters, although he has a joint prop-
erty with the writer, is not at liberty to publish them without
the consent of the writer; which is equivalent to saying that
the latter retains an exclusive right to control the publication.
He then adverts to the decision of Lord APSLY in *Thompson*
agt. *Stanhope,* as following the same doctrine, and declares that
he could not abandon a jurisdiction which his predecessors
had exercised, by refusing to forbid a publication in a case to
which the principle they had laid down, directly applied. (*Id.
pp.* 424–427.) He then says, " Such is my opinion; and it is not
shaken by the case of *Lord and Lady Percival* agt. *Phipps;*" and
significantly adds, " I think it will be extremely difficult to say
where the distinction is to be found between private letters of
one nature, and private letters of another nature;" by " diffi-

Woolsey agt. Judd and others.

cult," plainly meaning " impossible," since if a case could exist in which the distinction could be made, it was the case then before him, in which it was certain that the letters were not written for publication, nor then meant to be published—had no literary merits to render them worthy of publication, and if published would have no pecuniary value, consequently were not, in the sense of Sir Thomas Plumer, literary compositions, and literary property. We do not see how it was possible to over-rule more effectually the distinction, made by Sir Thomas Plumer, between private letters of one nature and those of another, and the doctrine which he founded on that distinction, than by refusing to apply them in a case to which, if they were ever to be admitted as law, they were evidently applicable, and in the most emphatic sense of the term.

It has, indeed, been said that the decision of Lord Eldon, in *Gee* agt. *Pritchard*, is not at all inconsistent with the obser-vations of the Vice-Chancellor in *Percival* agt. *Phipps*, and was not intended to overrule them. It is admitted that Lord Eldon decided that Mrs. Gee had a property in the letters which authorized him to grant and continue the injunction; but it has been insisted that the property, which he held him-self bound to protect, was her property in the letters as a ma-terial chattel—that is, her property in the paper on which the letters were written, and which was vested in her in conse-quence of their having been returned by the defendant, and being then in her possession. But, with high respect for the learned judge by whom this has been said, we find it impossible to believe that the ground of Lord Eldon's decision was such as has been stated. Had such been his meaning, Lord Eldon would never have referred to the decisions of Lord Hardwicke and Lord Apsly, as having established the principle by which he meant to be governed. Neither in *Pope* agt. *Curl*, nor in *Thompson* agt. *Stanhope*, was there a return of the original let-ters; and in the last case the material property in the letters, it was admitted, was vested in the defendant by an absolute gift from the writer. Any reference to these cases, had the ground of Lord Eldon's opinion, that Mrs. Gee had a property

in the letters which entitled her to an injunction, been such as has been supposed, would have been unnecessary and irrelevant; and had he not been fully aware that his opinion was inconsistent with the observations of his VICE-CHANCELLOR, he would not have said that "it was not at all shaken by *Percival* agt. *Phipps;*" nor would he have spoken at all of the difficulty of making a distinction between private letters of one nature and those of another, had he not been urged to make the distinction, and deemed it necessary to overrule it.

There are other reasons which make it impossible for us to believe that the meaning of Lord ELDON was such as has been imputed to him. As the letters had been returned to Mrs. Gee, we cannot understand how her property in the paper, which was in her actual possession, could be violated or endangered by a publication from the copies which the defendant had kept—and it is not pretended that she had any property in the paper on which these copies were written. And were a property merely in the paper on which letters are written a sufficient ground for an injunction to restrain their publication, it is manifest that the receiver, who all agree, unless he had returned the letters, has a property in the paper, would have the same right to obtain such an injunction, as the writer : yet we have seen that, in *Pope* agt. *Curl,* Lord HARDWICKE dissolved the injunction as to all the letters written to Mr. Pope, upon the ground that, although as receiver he owned the paper, he had no right as such to control and forbid the publication.

It is very true, as the learned judge to whose peculiar exposition of *Gee* agt. *Pritchard* we refer, has remarked, that Lord ELDON, in that case, disclaimed any right to interfere by an injunction, upon the ground, either that the publication of the letters by the defendant would be a breach of confidence, or would tend to wound the feelings of the plaintiff. It is true, he expressly said, that he could exercise jurisdiction on no other ground than that of property in the plaintiff. But the property which he affirmed to exist, and held himself bound to protect, was that which Lord HARDWICKE, in *Pope* agt. *Curl,* had clearly defined—the property which in all cases remains in

Woolsey agt. Judd and others.

the writer of letters—the property with which he does not part on sending them to the person to whom they are addressed, and which, so long as they exist, entitles him to say that, without his consent, they shall not be published. The property of Mrs. Gee, which Lord ELDON meant to protect, was intellectual, not material, not her property in the paper on which her letters were written, but in the letters themselves, as the media of intercourse, conveying her thoughts and wishes to an absent person—as communications of facts, and of her sentiments and feelings. It was these which she did not choose should be exposed to the world; and it was to prevent this exposure, *as involving a violation of her property*, that the injunction was granted.

It is not meant to be denied that Lord ELDON, in the close of his opinion in *Gee* agt. *Pritchard*, does advert to the return of the letters by the defendant as a material fact; but he adverts to it not as a fact creating or establishing the plaintiff's title to relief, but as excluding a defence which might otherwise have been relied on as a bar to his granting it.

The defendant, it has already been said, claimed a right to publish the letters in vindication of his own conduct; and in reference to this claim Lord ELDON said, that although the defendant, as receiver of the letters, had a joint property in them, so long as he retained the possession, which might have justified his intended publication, yet that, by returning the letters, he had relinquished this property, and renounced any right of publication he might previously have had.*

Had it been possible for us, after a very careful examination of *Gee* agt. *Pritchard*, to entertain any doubts that the import and effect of the decision are such as we have stated, those doubts would probably have been yielded to the reasoning and authority of Mr. Justice STORY, who, with *an entire decision*, has adopted and acted upon the same construction. We refer

* Vice-Chancellor M'Coun, in *Wetmore* agt. *Scovill*, (3 *Edwards*, 515,) the case to which the above observations refer, was doubtless misled by the marginal note of Mr. Swanston, the reporter, which is certainly so expressed as to place the decision of Lord ELDON upon the sole ground of the return of the letters.

not alone to his observations in his treatise on equity jurispru-
dence, (2 *Eq. Jur.*, §§ 945–948,) but also and principally to his
elaborate judgment in *Folsom* agt. *Marsh*, (2 *Story R.*, *p.* 100,)
in which the question of property in private letters distinctly
arose, and with great care was considered and determined.
In the opinion of this eminent judge, the whole doctrine rela-
tive to the rights of property in letters, and the jurisdiction of
equity to restrain their publication, together with the limita-
tions to which the doctrine is properly subject, is lucidly stated,
and in language which, (with a few alterations,) as the final
expression of our own views and convictions, we shall now
adopt.    We hold, then, " that the author of any letter or let-
ters, and his representatives, whether they are literary compo-
sitions or familiar letters, or letters of business, possesses the
sole and exclusive right of publishing the same, and that with-
out his consent the letters cannot be published, either by the
persons to whom they are addressed, or by any other.    But
that, consistently with this exclusive right of the author, the
person to whom the letters are addressed possesses, by impli-
cation, the right of publishing them upon occasions which re-
quire or justify the publication.    Thus, he may justifiably use
and publish them in a suit at law, or in equity, when such use
is necessary or proper to maintain his action or defence.    So,
also, if he has been aspersed or misrepresented by the writer
of the letters, or accused of improper conduct in a public man-
ner, he may publish such parts of the letter or letters, and no
more, as may be necessary to vindicate his character, and free
him from unjust obloquy and reproach.    But if he attempt to
publish the letters, or any parts of them, against the wishes of
the writer, and on occasions not justifiable, a court of equity
will prevent the publication by an injunction, as a breach of
that exclusive property in the letters which the writer re-
tained." (2 *Story R.*, *pp.* 110, 111.)

To the weight and accumulation of the authorities which we
have now cited and examined, there stand alone, opposed, two
decisions in our own courts—that of Vice-Chancellor M'Coun,
in *Wetmore* agt. *Scovill*, (3 *Edwards Ch. R.*, 515,) and of Chan-

cellor WALWORTH, in *Hoyt* agt. *Mackenzie*, (3 *Barb. Ch. R.* *p.* 314,) and upon these all special comments have been rendered unnecessary by the remarks we have already made. It will be sufficient to say, that in each case an injunction was denied, upon the sole ground that the letters of which the publication against the will of the writer, and for very dishonorable purposes, was sought to be restrained, possessed no value for publication, and none " of the attributes—[such is the language employed]—of literary compositions." We must, indeed, regret that the learned judges, by whom these decisions were pronounced, adopted so entirely the speculative views of Vice-Chancellor PLUMER, as to deem themselves justified in acting upon the distinction which he invented, and of which no trace is to be found in any case prior or subsequent; but as we believe, for the reasons that have so fully been given, that in so doing they departed from the established law, we must decline to follow their example.

We think that we are bound to declare the law as laid down by Lord HARDWICKE, and followed by Lord APSLY, and clearly expounded, and most distinctly affirmed, by Lord ELDON, and last, not least, by our own STORY. And it is with no ordinary satisfaction that, in closing this discussion, we find ourselves in a condition to affirm that the rules of law relative to the publication of private letters, are in perfect harmony with those of social duty and sound morality, and, in the protection which they afford to individuals, consult and promote the highest interests of society.

We therefore decide that the plaintiff, upon the face of his complaint, and according to the established doctrines of equity, is entitled to the injunction for which he prayed, and on the terms in which it was originally granted.

We are also of opinion, that no justifiable cause has been shown by the defendants, Judd and McKay, for their intended publication of the plaintiff's letter, of which, by secret and unexplained means, the defendant, Judd, has obtained a copy.

The receiver of a letter may, indeed, publish it, when its publication is shown to be necessary for the vindication of his

rights or conduct; but this license has never been extended to a person whose possession of a letter, or of the copy of a letter, as acquired without the consent of the writer or receiver, is wholly unlawful: could this objection be removed, it does not appear that these defendants seek to publish the letter for the purposes of vindicating themselves. Their sole object, as we understand the affidavits, is to fix what they deem an odious imputation upon the character or conduct of the plaintiff. Their object is not defence, but accusation. To such a design a court of equity can lend no aid or countenance.

The injunction must, therefore, be continued, as to the defendants Judd and McKay, until a final hearing and decision. It must, however, be dissolved as to the other defendants, who have sworn that no copy of the letter is in their possession, and that they have no control over its publication.

The order appealed from must be modified accordingly. No costs are given to either party.

BOSWORTH, J., dissented.